UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| KAREN J., | ) |
| | ) |
|     Plaintiff, | ) |
| | ) |
|   v. | )   No.  2:22 CV 75 JMB |
| | ) |
| MARTIN J. O'MALLEY, | ) |
| Commissioner of Social Security | ) |
| Administration, | ) |
| | ) |
|     Defendant. | ) |

**MEMORANDUM AND ORDER**

This matter is before the Court for review of an adverse ruling by the Social Security Administration.  The parties have consented to the jurisdiction of the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(c).

**I. Procedural History**

On July 10, 2020, Plaintiff Karen J. filed an application for disability benefits, alleging that her disability began on February 29, 2020 (Tr. 193) because of severe anxiety, depression, COPD, sleep apnea, and lung damage (Tr. 205).  Plaintiff's claims were denied upon initial consideration and reconsideration (Tr. 70-89; 91-116).  Plaintiff then requested a hearing before an ALJ (Tr. 134).  Plaintiff appeared at the hearing (with counsel) on December 15, 2021, and testified concerning the nature of her disability, her functional limitations, and her past work (Tr. 35-69).  The ALJ also heard testimony from Karen Terrill, a vocational expert ("VE") (Tr. 35-69).  After considering Plaintiff's testimony and the VE's testimony, and after reviewing the other relevant evidence of record, the ALJ issued a decision on December 28, 2021, finding that Plaintiff was not disabled, and therefore denying benefits (Tr. 14-32).  Plaintiff sought review of

the ALJ's decision before the Appeals Council of the Social Security Administration, which denied her claim on September 19, 2022 (Tr. 1-7). Accordingly, the decision of the ALJ is the final decision of the Commissioner. Plaintiff has therefore exhausted her administrative remedies, and her appeal is properly before this Court. See 42 U.S.C. § 405(g).

## II.  Evidence Before the ALJ

### A.  Disability and Function Reports and Hearing Testimony

In an August, 2020 Function Report, Plaintiff stated that her ability to work is affected by tiredness and breathlessness in addition to anxiety (Tr. 214). She has difficulty with self-help and needs assistance remembering to take her medications (Tr. 215-216). She does not cook because of lack of energy. She does household chores but needs to stop and rest several times and she shops less than once a month (Tr. 216-217). She only goes out alone if necessary and generally watches T.V. (Tr. 217). Her anxiety causes panic attacks in social situations, and she does not like being around people (Tr. 218). She has difficulty in all physical functional areas except reaching and can lift no more than ten pounds (Tr. 219). Plaintiff also indicates that she has difficulty with paying attention, following written instructions, and following spoken instructions; she also does not handle stress or change well (Tr. 219-220).

In a subsequent Function Report dated January, 2021, Plaintiff reiterated her fatigue and breathlessness in addition to anxiety and depression (Tr. 243). She also reiterated her activities of daily living, her functional and mental limitations, and her lack of interaction with others (Tr. 246-250).

Travis Brobst, Plaintiff's son, provided a letter in which he states that Plaintiff suffers with anxiety and COPD that cause her to become overwhelmed, avoid people, and have trouble

scheduling appointments (Tr. 279). He further indicates that her conditions have worsened over the past couple of years (Tr. 279).

Plaintiff testified that she is a married fifty-three year old who lives in a house with her husband than two adult sons (Tr. 43). She graduated high school and attended "a bit" of college (Tr. 44). She stopped working in February 2020 because she could not physically or mentally handle work (Tr. 44).

In particular, Plaintiff testified that she can no longer work because of COPD and anxiety (Tr. 48). These conditions cause her to stay in bed and sleep, make her feel unhappy and as if a "big cloud [is] looming" over her, and make her feel like a burden on her family (Tr. 49). She stated that she has difficulty going up stairs due to trouble breathing, she finds standing, walking, and lifting challenging because of fatigue and breathlessness, she cannot bend forward because of dizziness, she cannot be around fumes/chemicals like chlorine because she starts coughing uncontrollably, and she has trouble breathing in hot, humid, and cold conditions (Tr. 51, 55). She needs to lay down and nap during the day for two hours once or twice a day, three or four times a week (Tr. 52). Her medications also make her jittery and sleepy (Tr. 52-53). She does breathing treatments up to three time a day for fifteen to twenty minutes (Tr. 54). She has trouble sleeping because of a racing mind and trouble breathing/coughing (Tr. 56). Her anxiety causes her to stay indoors and avoid people (Tr. 57). Her depression causes crying spells and unhappiness (Tr. 57).

As to her daily living, Plaintiff testified that she smokes about two cigarettes a day since the last month prior to her testimony (at which prior time she was smoking 5 times a day) (Tr. 58). She does not belong to any social groups (Tr. 60). She does laundry with her husband's

help (which is in the basement), straightens up the house and dishes but her husband cooks (Tr. 60)

The VE testified that Plaintiff's past work as a sanitation engineer is an unskilled medium occupation but that it was performed at the heavy level and that her past work as a hand packager is medium work but performed at a light level (Tr. 60-61). The VE was asked to determine whether someone of Plaintiff's age, and with her education, work experience, and specific functional limitations, would be able to perform any of Plaintiff's past work. These functional limitations include the capacity to occasionally lift twenty pounds and frequently lift ten pounds; stand and/or walk six out of an eight-hour workday and sit up to six out of an eight-hour workday; occasionally climb ramps or stairs; never climb ladders, ropes, or scaffolds; occasionally stoop, kneel, crouch, and crawl; and, who would avoid extreme cold weather, extreme heat, extreme humidity and unprotected heights; and be exposed to no more than occasional irritants such as fumes, odors, dust, gases and poorly ventilated areas (Tr. 61-62). However, the hypothetical person could concentrate, persist, and remain on task and pace to perform simple, routine, and repetitive tasks that may involve multiple, noncomplex, simple, routine, and repetitive steps, tasks, or instructions (Tr. 62). Finally, the individual would have no public interactions and only occasional interaction with coworkers and supervisors (Tr. 63). The VE testified that such a hypothetical person would not be able to do Plaintiff's past relevant work (Tr. 63). However, such a person could do a full range of light, unskilled jobs such as photocopy machine operator, shipping and receiving weigher, and routing clerk (Tr. 63-64). These jobs would be available if the hypothetical were limited to standing/walking for no more than four hours in an eight hour work day (Tr. 64). And these jobs would be available if the hypothetical person could reach in all directions bilaterally (Tr. 67). The VE further testified that an employer

would permit no more than one sick day a month; but would offer a ten to fifteen minute break and a thirty minute to one hour lunch break (Tr. 64).

When questioned further, the VE indicated that if standing/walking was limited to two hours in an eight-hour workday, light work would be precluded (Tr. 65). And, an employee can only be off-task for five to ten percent of the work day; additional breaks would preclude employment as would leaving work early (Tr. 65-66).

### B.     Medical and Opinion Evidence

The administrative record before this Court includes medical records covering Plaintiff's health treatment from March 2019 through November 2021 in addition to medical opinions as to Plaintiff's functional capacity. Plaintiff focuses on work limitations caused by COPD and anxiety (which comprises a majority of the medical records). As such, the Court will focus on these areas in discussing the medical record.

#### 1. Medical Treatment notes

In the months leading up to March 2019, Plaintiff was doing "very well" managing her COPD (Tr. 299). However, when she presented at a follow up visit with Physician Assistant Taylor Wesley (who appears to be her primary caregiver), she complained of upper respiratory issues including congestion, cough, and "mildly worsened shortness of breath" – symptoms similar to her husband's upper respiratory infection (Tr. 299). Notes indicate that Plaintiff was also suffering from an upper respiratory infection which was exacerbating her COPD (Tr. 300). An inhaled corticosteroid was prescribed for 2-4 weeks and chest x-rays were taken – she was told follow up in 6 months (Tr. 300). Two subsequent visits with PA Wesley on April 4, 2019

and June 27, 2019 primarily concerned high blood pressure but Plaintiff's shortness of breath was noted and she was prescribed Lexapro for anxiety (Tr. 295-297).[1]

On January 30, 2020, Plaintiff complained of waking up at night to catch her breath and increased anxiety but there was no shortness of breath (Tr. 293). At that visit, a sleep study was ordered, she was told to stop Lexapro, and she was prescribed Fluoxethine Hydrochloride and prednisone for COPD (being used in addition to inhalers) (Tr. 294).

Plaintiff saw PA Wesley again on July 14, 2020 to, oddly, "establish care" (Tr. 320). She presented with general anxiety that was not responding to Prozac (Tr. 320). While she was positive for cough, fatigue, vomiting, agitation and other psychiatric factors, she was negative for other physical ailments, had a normal mood and affect, and normal breath sounds (Tr. 320-321). She was directed to seek counseling and medication therapy, and Prozac was replaced with Trintellix (Tr. 322). At her next visit, Plaintiff complained of shortness of breath and coughing that briefly improved with use of an inhaler, and no changes to her level of anxiety (Tr. 310). She was found to have no respiratory distress, normal judgment, cognition, memory, and behavior but was positive for psychiatric issues including agitation, decreased concentration, and nervousness/anxiousness (Tr. 310). Trintellix was increased and it is noted that she would be seeing a counselor in a week (Tr. 311). In addition, because her COPD was not considered well controlled, a nebulizer was ordered along with a referral to pulmonology (Tr. 312). Plaintiff followed up with similar concerns on September 8, 2020 (Tr. 360). She was started on Vistral for panic attacks and directed to continue counseling.

A follow-up with PA Wesley on October 7, 2020 revealed that Plaintiff stopped taking Trintellex as recommended because it was negatively affecting her sodium levels (Tr. 357). She

---

[1] In between these visits, an echocardiogram was conducted and appears to show normal heart function (Tr. 289-290).

was again positive for coughing and shortness of breath and anxiety but had no respiratory distress (Tr. 357). Her mood, attention, affect, and behavior were normal (Tr. 357). She was started on Latuda for potential bipolar disorder and directed to continue counseling (Tr. 358). A month later, Plaintiff reported that Latuda made her groggy through the day and that seeing a counselor resulted in some improvement (Tr. 392). She was directed to take Latuda at night (at an increased dosage) and encouraged to continue to see her counselor (Tr. 393, 395). It is noted that she had no new or worsening COPD symptoms (Tr. 397). On January 13, 2021, her mood was reported as "okay" and it was noted that she switched from Latuda to Lamictal (Tr. 423). She again was not in respiratory distress and had a generally normal physical and mental examination except that she was anxious, had fatigue, and was wheezing (Tr. 423-424). Lamictal (which was reported as well tolerated) was increased and she was told to continue counseling (Tr. 424, 440). However, by March 1, 2021 PA Wesley indicated that her mood was not well controlled with medication without side effects (Tr. 433). As such, he switched her medication to Vraylar (Tr. 433). At a follow up appointment in April, her symptoms were improved with no side-effects (Tr. 459). Her physical and psychological exams were normal – significantly, no breathing abnormalities or anxiety were noted. Her treatment plans were continued (Tr. 460).

In July 2021, she reported feeling stressed and anxious due to her current situation but that generally her mood was more stable (Tr. 510). Her examination was mostly normal with no breathing abnormalities or fatigue noted (Tr. 511-512). Vraylar was increased (Tr. 512).

As noted above, PA Wesley referred Plaintiff to pulmonology and counseling. On September 18, 2020, Plaintiff established care with Dr. Mohammad Jarbou, a pulmonologist, for COPD (Tr. 341). A review of physical and mental systems was generally normal but she had

decreased breath sounds (Tr. 341).  Dr. Jarbou informed Plaintiff that COPD is an "incurable disease" the progression of which can be slowed by quitting smoking, getting a flu shot every year, avoiding cough medicines, and avoiding triggers such as dust and smoke (Tr. 343).  He noted that she had moderate to severe COPD and that the "most important step in her treatment" was to quit smoking with a treatment regimen that included an inhaler and additional diagnostic testing including a sleep study (Tr. 343).   In January 2021, Plaintiff reported no improvement with Trelegy, but she was still smoking (Tr. 414).  Trelegy was continued along with diagnostic testing with similar instruction to quit smoking (Tr. 416).  Her COPD symptoms were considered "fairly well controlled" on February 25, 2021 (Tr. 434).

In April, 2021, she was referred to Dr. Khulood Ahmed (gastroenterologist) to address possible GERD that may be causing shortness of breath (Tr. 449).  At that appointment she was generally feeling well, alert, and cooperative, and in no acute distress but had coughing, shortness of breath and wheezing, anxiety and depression (Tr. 450-451).  Dr. Ahmed ordered an esophagogastroduodenoscopy (EGD) for further evaluation (Tr. 452).

In August, 2021, she was examined by nurse practitioner Johnathan Barnes upon referral by NP Wesley for COPD (Tr.  495).  She was directed to continue Trelegy but to stop using a Budesonide nebulizer (as explained -- "should ideally not need dual ICS therapy") and referred to pulmonary rehab (Tr. 497).   On that day she was diagnosed with moderately severe obstructive lung disease (as also found by Dr. Jarbou) (Tr. 497).  She followed up on October 14, 2021 (Tr. 477).  NP Barnes indicated that she was in no distress, that she was using Trelegy and a nebulizer daily, and that she started Chantix for smoking cessation (Tr. 478).  Her course of treatment – which included exercise and smoking cessation -- was continued and Daliresp was added to address mild exacerbations (Tr. 479).

In between her appointments with NP Barnes, she again saw NP Wesley for an acute respiratory condition in September, 2021.  On October, 18 2021, she also saw NP Wesley for anxiety which she indicated was poorly controlled and resulted in difficulty sleeping (Tr. 482).  She was started on Trazadone to address sleeplessness (Tr. 483).

On August 10, 2020, Plaintiff established care with Johnathan D. Morgans, a counselor, as suggested by PA Wesley, and she attended monthly counseling sessions through November, 2021 (Tr.401-411, 472-476).  During those sessions, Plaintiff discussed her anxiety, stressors, medications and their effects, and smoking.  At an October 5, 2020 session, she was diagnosed with PTSD, agoraphobia with panic attacks and bipolar II disorder (for which PA Wesley started her on Latuda) (Tr. 408).  Throughout 2020 and into January, 2021, there was "no change" in her progress.  However, at the February 1, 2021 sessions, Mr. Morgans noted that she had "significant regression," or "regression" that continued through the year, with two sessions showing "no change" and one session (in March, 2021) showing "some progress."  Throughout these sessions, Plaintiff was directed to rate her moods and journal, use breathing, exercise, family interactions, and "healthy distractions" to reduce stressors, and to stop smoking.  As noted above, she was prescribed Vraylar in March 2021 and dosage was increased in July 2021 but no other interventions were ordered to manage her anxiety.

    **2.**    **Medical Opinions**

In a November 11, 2021 Opinion, NP Barnes stated that Plaintiff's prognosis was fair and that the symptoms of her COPD include coughing and shortness of breath with walking (Tr. 514).  He indicated that clinical data support this impairment including a pulmonary function test and chest xray taken on August 11, 2021.  He further indicated that she is on medication and that there are no reported side effects.  As to her functional limitations, he indicated that she can sit

for four hours and stand for less than two hours in a typical work day; she needs at-will shifting positions, 3-4 breaks of thirty minutes to one hour, and two absences per month; she can never lift more than 20 pounds and occasionally lift less than 10 pounds; and, she should rarely stoop, crouch, climb ladders, and climb stairs (Tr. 515- 516).  Finally, he opines that her COPD would be exacerbated and would preclude full time work (Tr. 516).

Plaintiff's counselor, Mr. Morgans, also provided an opinion on December 9, 2021.  Mr. Morgans' handwriting is difficult to read.  However, his report contains check boxes for various limitations.  Mr. Morgans essentially indicates that Plaintiff has serious limitations, or that she is unable to meet competitive standards, in various mental abilities and aptitudes, to perform unskilled work (Tr. 519-520).

Finally, agency doctors Dr. Michael O'Day, Dr. Robert Cottone, and Dr. James Weiss, provided opinions.  Plaintiff does not directly challenge the merits of those opinions.

### III. Standard of Review and Legal Framework

To be eligible for disability benefits, plaintiff must prove that she is disabled under the Act.  See Baker v. Sec'y of Health & Human Servs., 955 F.2d 552, 555 (8th Cir. 1992); Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2001).  The Act defines a disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A) and 1382c (a)(3)(A).  A claimant will be found to have a disability "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education and work experience, engage in any

other kind of substantial gainful work which exists in the national economy." 42 U.S.C. §§ 423(d)(2)(A) and 1382c(a)(3)(B); see also Bowen v. Yuckert, 482 U.S. 137, 140 (1987).

The Social Security Administration has established a five-step process for determining whether a person is disabled. See 20 C.F.R. § 404.1520; Moore v. Astrue, 572 F.3d 520, 523 (8th Cir. 2009). Steps one through three require the claimant to prove (1) she is not currently engaged in substantial gainful activity, (2) she suffers from a severe impairment, and (3) her disability meets or equals a listed impairment. Pate-Fires v. Astrue, 564 F.3d 935, 942 (8th Cir. 2009); see also Bowen, 482 U.S. at 140-42 (explaining the five-step process). If the claimant does not suffer from a listed impairment or its equivalent, the analysis proceeds to steps four and five. Pate-Fires, 564 F.3d at 942. "Prior to step four, the ALJ must assess the claimant's residual functional capacity (RFC), which is the most a claimant can do despite her limitations." Moore, 572 F.3d at 523 (citing 20 C.F.R. § 404.1545(a)(1)). At step four, the ALJ determines whether claimant can return to her past relevant work, "review[ing] [the claimant's] [RFC] and the physical and mental demands of the work [claimant has] done in the past." 20 C.F.R. § 404.1520(e). The burden at step four remains with the claimant to prove her RFC and establish that she cannot return to her past relevant work. Moore, 572 F.3d at 523; accord Dukes v. Barnhart, 436 F.3d 923, 928 (8th Cir. 2006); Vandenboom v. Barnhart, 421 F.3d 745, 750 (8th Cir. 2005). If the ALJ holds at step four that a claimant cannot return to past relevant work, the burden shifts at step five to the Administration to establish that the claimant maintains the RFC to perform a significant number of jobs within the national economy. Banks v. Massanari, 258 F.3d 820, 824 (8th Cir. 2001); see also 20 C.F.R. § 404.1520(f).

The Court's role on judicial review is to determine whether the ALJ's finding are supported by substantial evidence in the record as a whole. Pate-Fires, 564 F.3d at 942.

Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Biestek v. Berryhill, 139 S. Ct. 1148, 1154 (2019). "[T]he threshold for such evidentiary sufficiency is not high." Id. Stated another way, substantial evidence is "less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a decision." Juszczyk v. Astrue, 542 F.3d 626, 631 (8th Cir. 2008); see also Wildman v. Astrue, 964 F.3d 959, 965 (8th Cir. 2010) (same). In determining whether the evidence is substantial, the Court considers evidence that both supports and detracts from the ALJ's decision. Cox v. Astrue, 495 F.3d 614, 617 (8th Cir. 2007).

The Eighth Circuit has repeatedly emphasized that a district court's review of an ALJ's disability determination is intended to be narrow and that courts should "defer heavily to the findings and conclusions of the Social Security Administration." Hurd v. Astrue, 621 F.3d 734, 738 (8th Cir. 2010) (quoting Howard v. Massanari, 255 F.3d 577, 581 (8th Cir. 2001)). Despite this deferential stance, a district court's review must be "more than an examination of the record for the existence of substantial evidence in support of the Commissioner's decision." Beckley v. Apfel, 152 F.3d 1056, 1059 (8th Cir. 1998). The district court must "also take into account whatever in the record fairly detracts from that decision." Id.; see also Stewart v. Sec'y of Health & Human Servs., 957 F.2d 581, 585-86 (8th Cir. 1992) (setting forth factors the court must consider). Finally, a reviewing court should not disturb the ALJ's decision unless it falls outside the available "zone of choice" defined by the evidence of record. Buckner v. Astrue, 646 F.3d 549, 556 (8th Cir. 2011). A decision does not fall outside that zone simply because the reviewing court might have reached a different conclusion had it been the finder of fact in the first instance. Id.; see also McNamara v. Astrue, 590 F.3d 607, 610 (8th Cir. 2010) (explaining that if substantial evidence supports the Commissioner's decision, the court "may not reverse,

even if inconsistent conclusions may be drawn from the evidence, and [the court] may have reached a different outcome").

## IV. The ALJ's Decision

The ALJ's decision in this matter conforms to the five-step process outlined above (Tr. 17-27). The ALJ found that Plaintiff met the insured status requirements through June 30, 2025, and had not engaged in substantial gainful activity since February 29, 2020 (Tr. 19). At step two, the ALJ found that plaintiff had the severe impairments of chronic obstructive pulmonary disease, obstructive sleep apnea, posttraumatic stress disorder, bipolar disorder, major depressive disorder, anxiety disorder, and agoraphobia (Tr. 19). The ALJ determined at step three that plaintiff did not have an impairment or combination of impairments that meets or medically equals the severity of a listed impairment (Tr. 19). The ALJ specifically addressed listings 3.02, 3.09, 12.04, 12.06, and 12.15 (Tr. 20).

The ALJ next determined that Plaintiff had the RFC to perform light work, except that she can lift and carry ten pounds frequently and twenty pounds occasionally; can stand and/or walk for up to four hours and sit for up to six hours in an 8-hour workday; can occasionally climb ramps and stairs; cannot climb ladders, ropes, or scaffolds; can occasionally stoop, kneel, crouch, and crawl; must avoid extreme cold weather, extreme heat, and extreme humidity; may be exposed to no more than occasional irritants such as fumes, odors, dust, gases, and poorly ventilated areas; should avoid unprotected heights; has the ability to concentrate, persist, and remain on task and pace to perform simple, routine, and repetitive tasks, which may involve multiple, non-complex, simple, routine, and repetitive steps, tasks, or instructions; should have no public interaction; can work around co-workers but with only occasional interaction with co-workers and supervisors (Tr. 21). In assessing Plaintiff's RFC, the ALJ summarized the medical

record; written reports from Plaintiff; Plaintiff's work history; and, Plaintiff's testimony regarding her abilities, conditions, and activities of daily living (Tr. 21-25).

At step four, the ALJ concluded that Plaintiff is not capable of returning to her past relevant work (Tr. 25). However, at step five, the ALJ found that Plaintiff could perform other work in the national economy including photocopy machine operator, shipping and receiving weigher, and routing clerk (Tr. 26). Thus, the ALJ found that Plaintiff was not disabled within the meaning of the Social Security Act from February 29, 2020 to December 28, 2021 — the date of the decision (Tr. 27).

## VI. Discussion

In her brief, Plaintiff argues that the ALJ failed to properly evaluate the severity of her COPD and anxiety and did not give appropriate weight to Mr. Morgans' and NP Barnes' opinions that she has significant functional limitations.

When evaluating opinion evidence, the ALJ is no longer required to give controlling weight or any weight to opinion evidence. 20 C.F.R. 404.1520(a). Instead, the ALJ is to consider all medical opinions equally and evaluate their persuasiveness according to several specific factors. 20 C.F.R. § 404.1520c(b)(2). Of these factors, an ALJ must explain how she considered the factors of supportability and consistency in her decision but need not explain how she considered the other factors. 20 C.F.R. § 404.1520c(b)(2).[2] The supportability factor provides that "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be." 20 C.F.R. § 404.1520c(c)(1). In articulating how she considers the

---

[2] The other factors include the relationship with the claimant, specialization, and other factors which can include whether additional evidence was submitted after the date of the opinion. 20 C.F.R. § 404.1520c(c)(3-5).

supportability factor, an ALJ may properly consider that the physician's own treatment notes do not support the physician's opinion, that the physician did not consider certain evidence, or that the physician did or did not provide a detailed explanation for the opinion.  Starman v. Kijakazi, 2021 WL 4459720, at *4 (E.D. Mo. Sept. 29, 2021) (listing cases).  The consistency factor states that "[t]he more consistent a medical opinion(s) or prior administrative finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be."  20 C.F.R. § 404.1520c(c)(2).

The ALJ found that NP Barnes' opinion was not persuasive because it was not supported by "significant narration or explanation, and it is predominantly checked boxes."  She also found that the opinion was inconsistent with the record as a whole which "generally shows the claimant's respiratory conditions are fairly well controlled and exams were typically normal."  An ALJ can be justified in rejecting an opinion that is in a checkbox format if it contains no explanation of the limitations despite containing areas where the doctor could explain the limitations found.  See Nolen v. Kijakazi, 61 F.4th 575, 577 (8th Cir. 2023) (finding that the ALJ appropriately gave a treating doctor's opinion little weight where the doctor "checked some boxes and left blank the short-answer section asking what objective medical findings supported his assessment"); Thomas v. Berryhill, 881 F.3d 672, 675 (8th Cir. 2018) (finding that a treating physician's opinion, made in conclusory fashion and which "cite[s] no medical evidence and provide[s] little to no elaboration" can be rejected on that basis alone).

NP Barnes did offer some justification for his findings – he cites to diagnostic findings from August 11, 2021.  However, he provides no explanation of the functional limitations he found – he does not elaborate on the efficacy of her medications, he does not identify any

Page **15** of **19**

limitations found from his examinations, and he does not elaborate on why he considered her prognosis "fair."  The diagnostic testing from August 11, 2021 (Tr. 504-508) confirmed Plaintiff's diagnosis of moderately severe COPD but do not illuminate functional limitations (the ALJ noted that testing revealed "no acute pathology" (Tr. 22)).  Indeed, at the appointment immediately after testing, Plaintiff appeared "in no distress" and although she had coughing and her breath sounds were "slightly diminished," they were clear and she had no crackles or wheezes (Tr. 495-496).  Accordingly, the ALJ was justified in finding that NP Barnes' opinion was not persuasive

Certainly, as Plaintiff points out, she was diagnosed with moderately severe COPD and she did have, at times, trouble breathing especially when her COPD was exacerbated by illness.  The ALJ noted that she had wheezing and expiratory crackle (Tr. 23).  However, the ALJ is not tasked with outlining conditions but in determining how those conditions affect function.  The ALJ found that examinations were typically normal (citing to examinations in July, 2020, August, 2020, September, 2020, October 2020, January 2021, February, 2021, April, 2021, July, 2021, August, 2021, September, 2021, and, October, 2021 for notations of no respiratory distress), that Plaintiff responded to medication, that she did not need oxygen, and that she was directed to stop smoking as a way of managing her condition (Tr. 23).  As indicated above, there were no records outlining breathing difficulties in the last 6 months of 2019 and for most of the early part of 2020.  Plaintiff did try a variety of medications to control her COPD symptoms in 2020 and 2021 with varied results.  By mid to late 2021, however, she was started on Trelegy which appeared effective and with no side effects.  Certainly, conditions that are controlled or managed with treatment are not considered disabling.  Wilson v. Chater, 76 F.3d 238, 241 (8th Cir. 1996).

And, when she was seen by a specialist, she was told that smoking and being around dust would exacerbate her symptoms and she was directed to stop smoking, get a flu shot, and avoid irritants as a way of controlling her symptoms. However, Plaintiff continued to smoke throughout the relevant time period notwithstanding sporadic efforts at cessation by using Chantix. The ALJ noted that "despite her respiratory impairments" and being told to stop, Plaintiff continued to smoke cigarettes (Tr. 23). See Choate v. Barnhart, 457 F.3d 865, 872 (8th Cir. 2006) (finding that an ALJ may make a credibility determination based on the claimant's failure to follow medical advice which includes quitting smoking). The ALJ pointed out that, notwithstanding impairments, Plaintiff was capable of completing housework, managing her personal care, engaging in social activities, and liviny with her husband and two adult children. In fashioning the RFC, the ALJ took into account Plaintiff's respiratory condition by limiting her to light work with exertional limitations and limitations on exposure to irritants.[3]

As for Mr. Morgans' opinion, the ALJ found that in addition to suffering the defects of NP Barnes' opinion, it was not supported by Mr. Morgans' own treatment notes. Mr. Morgans' assessment is in a checkbox format with little to no explanation. See Swarthout v. Kijakazi, 35 F.4th 608, 611 (8th Cir. 2022) (finding physician's opinion "entitled to relatively little evidentiary value on its face, because it was rendered on a check-box and fill-in-the-blank form"). His treatment notes do not provide insight into the functional limitations he finds – there are no mental status examinations, and his notes primarily consist of Plaintiff's statements about her stressors and moods. When Plaintiff was examined by NP Barnes, her mental status examinations were normal as to functioning, but she did report anxiety regularly. NP Barnes

---

[3] Plaintiff does not challenge the ALJ's determination that agency doctor evaluations were persuasive. In particular, the ALJ found Dr. O'Day's and Dr. Weiss' opinions regarding her physical functional capacity persuasive. Both Drs. O'Day and Weiss opined that Plaintiff was capable of standing or walking for six hours in an eight-hour workday and sitting for six hours, and is limited in various other postural and functional movements (Tr. 78-82; 104-109).

tried different medications and noted that Vraylar was efficacious with no side effects. As such, no further interventions were directed to manage her anxiety.

The ALJ found that Plaintiff was not as restricted as Mr. Morgans suggested because she was treated conservatively for her mental health conditions. Brown v. Astrue, 2012 WL 8868789, *14 (E.D. Mo. Mar. 15, 2012); see also Reece v. Colvin, 834 F.3d 904, 909 (8th Cir. 2016) (affirming claimant was not disabled, in part, because claimant's treatment was routine and conservative); Rivers v. Saul, 2022 WL 1080937, at *13 (E.D. Mo. Apr. 11, 2022) (finding that treatment that does not involve more aggressive treatments than appointments with a psychiatrist, therapy, and prescription medications is routine.). Coupled with lack of explanation in his opinion, the ALJ was justified in finding that it was not supportable or consistent. As to the other factors that the ALJ should consider, she was not required to articulate how she considered those factors.

Finally, as the ALJ noted, Plaintiff's mental status examinations showed appropriate behavior, an ability to concentrate, intact memory, normal speech, and normal insight and judgment, even though she may also have presented as anxious or depressed (Tr. 23). Moreover, a number mental health issues were the result of situational stressors. See Gates v. Astrue, 627 F.3d 1080, 1082 (8th Cir. 2010) (finding that the ALJ did not err in relying on medical records that supported the conclusion that the claimants' depression was situational in nature and improved with counseling and medication). The ALJ further found agency Dr. Cottone's assessment, that Plaintiff was capable of working with reduced public contact, persuasive and included that limitation in the RFC (Tr. 103).

\* \* \* \* \*

For the foregoing reasons, the Court finds that the ALJ's determination is supported by substantial evidence on the record as a whole.

Accordingly, **IT IS HEREBY ORDERED** that the decision of the Commissioner is **affirmed**.

A separate Judgment shall accompany this Memorandum and Order.

Dated this 26th day of January, 2024

*/s/ John M. Bodenhausen*
JOHN M. BODENHAUSEN
UNITED STATES MAGISTRATE JUDGE